221 P.3d 370

Paul KATAN, an individual,
Plaintiff/Appellee,

v.

CITY OF PRESCOTT, a municipal corporation; Liz Burke, in her official capacity as the Prescott City Clerk, Defendants/Appellants.

No. 1 CA–CV 09–0611 EL.

Court of Appeals of Arizona,
Division 1, Department D.

Dec. 3, 2009.

Gil Shaw, Prescott, Attorney for Plaintiff/Appellee.

City of Prescott Legal Department by Thomas Lloyd, Chief Assistant City Attorney, Prescott, Attorneys for Defendants/Appellants.

Arizona Center for Law in the Public Interest by Timothy M. Hogan, Phoenix, Attorney for Intervenor Taxpayer Protection Committee.

## OPINION

IRVINE, Judge.

¶ 1 This case concerns a challenge to the general election ballot for the 2009 City of Prescott election. Paul Katan argues that he should have been listed as one of six candidates on that ballot. The City disputes this because Katan was not one of the six candidates receiving the highest number of votes in the primary election. The trial court agreed with Katan and ordered the City to include Katan on the ballot. Because we conclude that the City Charter does not provide for including Katan on the general election ballot, we reverse.

### FACTS AND PROCEDURAL BACKGROUND [1]

¶ 2 The City held a primary election for three vacant City Council seats on September 1, 2009. Eight candidates were listed on the ballot. Under the terms of the City Charter, a candidate receiving a majority of all votes cast in the primary would be elected. Prescott, Ariz. City Charter, Art. IX, § 6 (2006).[2] If the vacant seats are not filled at the primary, a general election is required and the candidates receiving the highest votes in the primary are included on the general election ballot. Id., Art. IX, § 7.[3] No candidate received a majority of votes cast in the City primary, so under the terms of the Charter the top six candidates on the primary ballot, twice the number of offices to be filled, would be included on the general election ballot.

¶ 3 The official canvass of the primary election was completed September 8, 2009. Katan finished seventh in the primary, twenty-four votes behind the sixth place candidate. Bob Bell, an incumbent member of the City Council, finished fifth in the primary. A few days after the official canvass, Bell informally notified the City Clerk that he was not going to run in the general election. Based on this informal notice, the City Clerk informed the County election officials who were administering the election for the City that Bell's name should not be included on the general election ballot. On September 15, 2009, Bell formally announced he would not continue to run for the City Council position. The general election ballots were sent to the printers without Bell's name on or about September 16, 2009. Election officials began mailing out ballots on or about September 23, 2009.

¶ 4 Shortly after Bell made his announcement, Katan demanded that he be placed on

---

1. This matter comes to us as an appeal from a judgment of the superior court. Consequently, our review is limited to the record that existed in the trial court. To the extent the parties have submitted supplemental facts and affidavits that were not included in the trial court record, we have disregarded them.

2. Section 6 reads: "At the primary election any candidate who shall receive a majority of all the votes cast at such election for that office shall be declared elected to the office for which he is a candidate, and no further election shall be held as to said candidate."

3. Section 7 reads:

"If at any primary election there be any office or offices to which no candidate therefor was

elected, then, said election shall be considered a primary election for the nomination of candidates for such office or offices, and a second or general election shall be held to vote for candidates to fill such office or offices. The candidates, not elected at such first election, equal in number to twice the number to be elected to any given office, or less if so there be, and who received the highest number of votes for the respective offices at such first election, shall be the only candidates at such second election; provided, that if there be any person who under the provisions of this section, would have been entitled to become a candidate for any office except for the fact that some other candidate received an equal number of votes therefor, then all such persons receiving said equal number of votes shall likewise become candidates for such office."

the general election ballot, arguing that he was now one of the six candidates receiving the highest number of votes in the primary. The City refused, but discussion ensued between the City and Katan as to whether the City would notify voters about his write-in candidacy. Ultimately, the City did not do so.

¶ 5 On October 9, 2009, Katan filed a special action complaint in superior court asking the court to order his name be added to the general election ballot. The court held an evidentiary hearing on October 14, 2009. On October 15 the superior court issued detailed findings and conclusions. Citing Article IX, Section 7 of the City Charter the court concluded that Katan should be included on the ballot. It explained:

> The candidates with the six highest votes were identified following the primary election on September 1, 2009. Those results were confirmed by the Official Canvass of Votes on September 8th. According [to] the testimony, the normal procedure would have then involved issuing Certificates of Nomination to all six candidates and placing their names on the printed ballots. However, neither of these two things occurred. Instead, no candidate was issued a Certificate of Nomination and one of the names identified on the Official Canvass of Votes by the City Council was deleted from the printed ballots.
>
> It is undisputed that Mr. Bell withdrew his name prior to the ballots being printed. It is also not disputed that it was possible to change the names on the ballot after Mr. Bell withdrew and before they were printed. When questioned why Plaintiff's name was not advanced into 6th place and put on the ballot after Mr. Bell withdrew, the City Clerk testified she did not believe she had any legal authority to do so. However, she also testified she was not relying on any legal authority when she made the decision to remove Mr. Bell's name from the ballots.
>
> . . . .
>
> Had Certificates of Nomination been issued to each of the six candidates and the ballots printed with all six names, this Court would deny Plaintiff's requested re-

lief. However, that did not occur. With no Certificates of Nomination having been issued, coupled with Mr. Bell's withdrawal from the race and the ballots not being printed, the City should have applied the plain language of Section 7 and determined the six remaining candidates with the highest number of votes. Given the facts in this case, the Court interprets Section 7 as requiring this result.

Consequently, the court issued a temporary restraining order/preliminary injunction prohibiting the City from conducting its general election and directing the City Clerk to issue a Certificate of Nomination to Katan and place his name on the general election ballot.

¶ 6 The City filed a notice of appeal on October 19, 2009. Pursuant to Arizona Rules of Civil Appellate Procedure Rule 8.1, we granted expedited appellate review. Following a telephonic hearing, we stayed the order of the superior court and ordered further briefing. After considering those briefs, we reversed the superior court and vacated its temporary restraining order/preliminary injunction and writ of mandamus, with a full discussion to follow in a later opinion. This is that opinion.

## DISCUSSION

■ ¶ 7 The City conducts a nonpartisan primary election, followed by a general election if the available seats are not filled by candidates receiving a majority of votes cast in the primary. The purpose of the primary is to narrow the field of candidates so as to increase the chance that the person ultimately elected is chosen by a majority of the voters, or at least is not actively opposed by a majority. Katan does not dispute that he received the seventh highest number of votes in the City primary. Nevertheless, he argues that he moved into sixth place when Bell withdrew. The City disputes this, but first argues the superior court did not have jurisdiction to hear Katan's claim.

■ ¶ 8 Because a court's jurisdiction over election contests is purely statutory and not a matter of common law, if no statute exists granting the court jurisdiction, the court has no jurisdiction to act. *See Brown v. Superi-*

or Court, 81 Ariz. 236, 242, 303 P.2d 990, 994 (1956); *Hunt v. Superior Court,* 64 Ariz. 325, 330–31, 170 P.2d 293, 296 (1946). The statutory authority for contesting a city election is Arizona Revised Statutes ("A.R.S.") § 16–674 (2006), which provides that any such contest shall be filed "on the same grounds and in the same manner as contests" for state office. The state requirements provide that a court contest be filed "within five days after completion of the canvass of the election and declaration of the result." A.R.S. § 16–673 (2006). The City argues that Katan failed to file his complaint within five days of the September 8 canvass, so his claims were untimely and should have been dismissed.

¶ 9 Katan responds that he is not contesting Bell's legal qualifications to run as a candidate, nominating petitions, or any conduct of the primary election. Instead, he is questioning the City's compliance with its Charter. He explains:

> With the City's arbitrary removal of Bell, the City effectively wiped Bell's candidacy *and the votes for him,* from the electoral map. Katan sought only the court's declaration of **whether or not *the Charter* was violated,** a fundamental organic challenge that all superior courts have jurisdiction to hear. This challenge just happened to impact an election.

Katan also argues that no one outside City government knew Bell was withdrawing and the City acted without legal authority when it removed Bell's name from the general election ballot, so he should not be held to the five day window to challenge the primary election results. In any event, he also includes a claim for mandamus relief that is not dependent on the statute.

¶ 10 We agree with Katan that his complaint does not challenge the results of the primary election. As he acknowledges, he had no basis to contest the results of the canvass at the time it was done. Instead,

Katan challenges City actions occurring after the canvass, namely its refusal to place him on the ballot in Bell's place. Under these circumstances, we are not persuaded that A.R.S. § 16–673 deprived the superior court of jurisdiction.[4]

¶ 11 Nevertheless, we believe the official results of the primary election are an important aspect of this case. A key fact here is that the top six candidates in the primary election were conclusively determined by the September 8 canvass. Katan was not one of the top six. Consequently, as of September 8 he was eliminated as a candidate and was not eligible to be listed on the general election ballot.[5]

¶ 12 The question then becomes whether anything that happened after September 8 could restore, recreate or renew Katan's eligibility to be on the ballot. He argues the City's action in removing Bell did so, but he also states that the City acted without legal authority in removing Bell from the ballot. Neither Katan nor the City argues that Bell should be restored to the ballot, nor has Bell sought to be restored to the ballot. Therefore, whether Bell was improperly removed from the ballot is not an issue presented in this appeal. In any event, whether Bell is on the ballot or not we fail to see how Katan's right to be on the ballot could be restored once he was eliminated by the primary election results.

¶ 13 Katan argues that Section 7 requires the City to include the top six candidates from the primary election on the general election ballot and he became the sixth once Bell withdrew. The relevant sentence of Section 7 provides that "[t]he [top six] candidates, not elected at such first election" "shall be the only candidates at such second election." Prescott, Ariz. City Charter, Art. IX, § 7. Katan argues he was and continues to be a candidate, so when Bell withdrew he

---

4. Our supreme court has cautioned against using mandamus as an alternative to statutory authorization for court intervention in an election. *See Transp. Infrastructure Moving Arizona's Economy v. Brewer,* 219 Ariz. 207, 213–14, ¶¶ 31–35, 196 P.3d 229, 235–36 (2008). If Katan were simply challenging the results of the canvass, mandamus would not be appropriate.

5. We recognize that Katan qualified as a write-in candidate for the general election. Our discussion relates only to his eligibility to be listed as a candidate on the general election ballot.

moved into the top six. We disagree. The first use of the word "candidate" in the sentence is referring to candidates listed on the primary election ballot. The second reference to "candidate" refers to candidates to be listed on the general election ballot. The sentence plainly prevents anyone not among the top six in the primary from being listed on the general election ballot. Therefore, under the terms of the Charter, Katan ceased to be a candidate eligible to be listed on the general election ballot when the canvass finalized the primary vote. Nothing in the Charter restored his eligibility once his seventh place showing ended it.

¶ 14 This case is analogous to *Tellez v. Superior Court*, 104 Ariz. 169, 450 P.2d 106 (1969), which involved an election for Pima County Treasurer. Three candidates were listed on the Democratic primary ballot. *Id.* at 171, 450 P.2d at 108. One of them died several weeks before the election, but after the primary election ballots had been printed and distributed. *Id.* The deceased candidate received the highest number of votes. *Id.* The candidate receiving the second highest vote sought and obtained an order from the superior court placing his name on the general election ballot, arguing that votes for a candidate who is deceased before the election should not be counted in determining who receives the highest vote. *Id.* at 170, 450 P.2d at 107.

¶ 15 Upon review, the Arizona Supreme Court disagreed, explaining:

> The general rule which we think the better is that the votes cast for a deceased, disqualified or ineligible person are not to be treated as void or thrown away but must be counted in determining the result of an election as regards to other candidates where such deceased or disqualified person received the highest number of votes. The courts have held that the result of its application is to render the election nugatory and to prevent the election of the person receiving the next highest number of votes.

*Id.* at 171, 450 P.2d at 108. The court then held that the candidate with the next highest vote total was not nominated. *Id.* at 173, 450 P.2d at 110. Finally, the court ruled that the statutory procedure to fill a vacancy caused by the death of a candidate after a partisan primary election would apply even if the death occurred before the election, so the Democratic Party of Pima County could designate the party's nominee on the ballot. *Id.*

¶ 16 This case is similar to *Tellez* in that a candidate who "won" the primary is unable or unwilling to be elected at the general election. As in *Tellez*, here a candidate who "lost" the primary seeks to replace the winning candidate on the general election ballot. *Tellez* shows that no such right exists. Contrary to Katan's assertion, the votes for Bell in the primary election did count. Bell was among the top six candidates; Katan was not. Consequently, just as the second place candidate in *Tellez* had no right to advance to the Pima County general election ballot, Katan was not entitled to be on the City general election ballot.

¶ 17 Katan argues *Tellez* is distinguishable because in that case the candidate's death occurred after the ballots were printed. We disagree. In *Tellez*, the ballots at issue were the general election ballots. Those had not been prepared. Indeed, the superior court had ordered the second place finisher from the primary to be included on the general election ballot. Thus the supreme court's holding that the second place candidate was ineligible to move on to the general election was not based on whether there was time to include him on the ballot. Katan's situation is the same. He did not win the primary. Bell's ineligibility or unavailability does not change this, any more than it did for the second place candidate in *Tellez*.

¶ 18 In *Tellez*, the solution to the death of the winner of the partisan primary election was his replacement by the county party pursuant to specific statutory procedures. *Id.* at 173, 450 P.2d at 110. Even assuming that it was proper to remove Bell from the ballot, we find no authority or mechanism for replacing him with Katan or anyone else. The statute authorizing replacements in partisan elections, A.R.S. § 16-343, does not apply to nonpartisan elections such as the one conducted by the City. The trial court apparently read the City Charter to require six candidates for three council seats. As

noted above, we read it differently. The primary election narrowed the field of candidates to no more than six. Bell's removal from the ballot still left the voters with a choice between five candidates, all of whom were among the top six candidates in the primary election. The City Charter does not contain any mechanism to replace one of the top six from the primary, and we will not create one.

¶ 19 We also disagree with the trial court that this issue hinges on whether the City Clerk issued Certificates of Nomination. No party cites any authority for issuing such certificates in City Council elections, much less any authority for giving the lack of them conclusive effects.[6] When the official canvass was completed, Katan was not entitled to a certificate of nomination. He did not later become entitled to one because none were issued to the top six candidates. In any event, issuing the Certificates of Nomination appears to be a purely ministerial act by the City Clerk that does not by itself confer a substantial right.

### CONCLUSION

¶ 20 We reverse the judgment of the trial court and vacate its temporary restraining order/preliminary injunction prohibiting the City from conducting its general election and its writ of mandamus directing the City Clerk to place Katan's name on the ballot.[7] We remand for entry of judgment for the City.

CONCURRING: JOHN C. GEMMILL, Presiding Judge and JON W. THOMPSON, Judge.

---

6. Statutory references to certificates of election or nomination relate to offices not at issue in this appeal. *See* A.R.S. §§ 16–645 (2006) (party nominees); –650 (2006) (certificate of elections by secretary of state); –665 (2006) (certificate of election in recounts).

7. Because we conclude that the trial court erred in its interpretation of the City Charter, we need not address the City's argument that Katan's claim is barred by laches.